UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
IULIAN CRISTIAN RADU,

      Petitioner,

 -against-

PETRUTA TOADER, also known as
PETRUTA NICOLAIE, and formerly known
as PETRUTA RADU,

      Respondent.
--------------------------------------------------------X

**MEMORANDUM &
ORDER**

11-CV-1676 (ERK) (JMA)

A P P E A R A N C E S:

Charles I. Poret
Scott Kessenick
Dechert, LLP
1095 Avenue of the Americas
New York, NY 10036
 *Attorneys for Petitioner*

Gabriel Tapalaga
Tapalaga & Associates, PC
44 Wall Street, 10th Street, Fl. 44
New York, NY 10005
 *Attorney for Respondent*

**AZRACK, United States Magistrate Judge:**

  Iulian Cristian Radu ("petitioner") brings this action against Petruta Toader ("respondent") for the return of their child L.R.[1] to Romania pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention") as implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. ("ICARA"). Petitioner is a Romanian citizen, and currently lives in Romania. Pet.'s Verified Pet. for the Return of a Child to Romania Under the Hague Convention ("Pet.'s Br.") ¶¶ 7–8,

---

[1] In order to protect the child's identity, the child's initials will be used instead of his name pursuant to Federal Rule of Civil Procedure 5.2.

1

ECF No. 1; Pet.'s Mem. of Law in Supp. of Verified Pet. for the Return of a Child, ("Pet.'s Mem. of Law") 1, ECF No. 2.  Respondent and L.R. are also Romanian citizens, but currently reside in Forest Hills, New York.  Compl. ¶ 8.

The petition was filed on April 6, 2011.  Compl., ECF No. 1.  The Honorable Edward R. Korman issued an order later that day commanding respondent to appear on April 14, 2011, to show cause why L.R. should not be returned to Romania.  Order to Show Cause, ECF No. 3.  On April 21, 2011, the parties consented to me to preside over this case.  ECF No. 19.  Prior to the hearing, both petitioner and respondent filed briefs outlining their respective positions.  Pet.'s Mem. of Law; Resp.'s Verified Answer to Pet. for the Return of a Child To Romania ("Resp.'s Br."), ECF No. 13.  After attempts to settle this matter failed, the hearing occurred on June 27, 2011. ECF No. 29.  For the reasons stated below, the Hague Convention petition is denied.

## I. BACKGROUND

### A. The Family in Romania

Petitioner and respondent were born in Romania and are Romanian citizens.  Pet.'s Mem. of Law 3.  In January 2003, the two married in Romania.  Id.; Transcript of June 27, 2011 Hearing ("Tr.") 4:21–23.  Two years later, on January 13, 2005, L.R. was born in Romania. Pet.'s Mem. of Law 3.  Petitioner, respondent, and L.R. lived together in respondent's parent's home in Bucharest, Romania until August 2009.  Id.   Petitioner contends that he maintained a strong and loving relationship with his son.  Id.  Petitioner attests that while the family lived together, he helped provide L.R. with medical care, clothing, and other necessary items, and dropped him off at kindergarten.[2]  Pet.'s Br. ¶ 12; Tr. 8:18–22.  Respondent counters that when she would ask petitioner to pick up the child from school, he would respond that he needed to

---

[2] Petitioner's family members also spent time with the child and picked him up from school.  Pet.'s Mem. of Law 3.

2

sleep or felt too tired. Tr. 34:12–17. Respondent alleges that during their marriage, petitioner was a "very lazy person," who played videogames frequently. Tr. 34:7–15.

### B. The Divorce Decree

In May 2009, respondent took a business trip to New York for approximately five days. Pet.'s Mem. of Law 4. Upon her return, she demanded that the family move to New York. Id. When petitioner refused, respondent filed for divorce at the end of May 2009. Id. In June 2009, petitioner and respondent traveled to Turkey in hopes of salvaging their marriage.[3] Tr. 10:1–8. Upon returning from the trip, however, respondent decided to end the marriage and filed for divorce.

Petitioner contends that after respondent filed for divorce, she refused to let him see his child.[4] Tr. 10:12–25. In August 2009, petitioner went to respondent's place of employment to confront her about the divorce and his visitation access to L.R. Resp.'s Br. ¶¶ 60–62; Tr. 11, 36:4–7. Respondent recounts that when petitioner arrived at her work, petitioner yelled at her and choked her in front of her co-workers. Resp.'s Br. ¶ 62; Tr. 36:8. Respondent contends that her colleagues had to pull petitioner away from her, and that she and her boss called the police.[5] Tr. 36:8. Respondent also alleges that petitioner keyed the hood of her car. Tr. 36:23; Resp.'s Br. ¶ 62. Petitioner denies both of these allegations. Tr. 11:19–22.

---

[3] Petitioner attempted to discredit respondent on the stand by asking respondent why, when she traveled to Turkey for a family vacation, she told her attorney she was traveling for business. Tr. 50:1–58:15. Respondent clarified that while the initial reason for the trip was for vacation, once her boss found out about her travel plans, he requested that respondent conduct business research during her stay; thus, the trip had some business purposes. Tr. 56:2–11. I find respondent's explanation to be credible.

[4] On one occasion, petitioner called the police after trying to visit his son. Tr. 10:12–25. Petitioner admits that respondent also called the police once after petitioner knocked on respondent's door in an attempt to see L.R. Id.

[5] Respondent did not submit the police phone record into evidence, but attested at the hearing that she could obtain a copy if necessary. Tr. 42:7–14.

On October 2, 2009, a Bucharest court issued a Divorce Decree[6] granting respondent sole custody of the child and granting petitioner visitation rights, for one year, for two weekends each month, two weeks during the summer, one week during winter vacation, and one week during the Easter holiday.[7]  Pet.'s Mem of Law 4; Pet.'s Br., Ex C. ("Divorce Decree").  The Divorce Decree provides that, pursuant to Romanian Family Code and Law no. 272/2004, the noncustodial parent "shall retain the right to a personal relationship with the child," have input in the "upbringing and education of the child," and maintain a "close emotional relationship" with the child.  Divorce Decree 3–4.  The Decree also requires that petitioner pay 300 Lei each month in alimony, which he has continued to do since the divorce.  Id.; Tr. 12:2–16.  The court explicitly defines the custody determination as a "final and irrevocable court decision."  Divorce Decree 4.

### C. After the Divorce

Between the divorce in October 2009 and L.R.'s removal from Romania in September 2010, petitioner exercised his visitation rights and provided financial and emotional support to the child.  Pet.'s Mem. of Law. 4–5.  From approximately December 2009 to June 2010, respondent permitted petitioner to have additional visits with the child beyond his decreed visitation schedule.  Id.  Petitioner testified that he actively participated in L.R.'s life and cared

---

[6] The Divorce Decree stated that the dissolution of the marriage was by "shared fault."  Divorce Decree 2; Tr. 43:1–24. Both parties were represented by counsel during the signing of the Decree and there is no other evidence to indicate that there was any illegality in its construction.

[7] The parties dispute whether the Divorce Decree limits petitioner's visitation rights to a period of one year.  See Pet.'s Bench Mem. Concerning Pet.'s Visitation Rights Under the Parties' Divorce Order and Romanian Law ("Pet.'s Visitation Mem.") 1–7, ECF No. 27; Resp.'s Br. ¶ 58.  Petitioner submitted an amendment to the Divorce Decree issued by a Bucharest Court on January 1, 2011, which provided that the one-year limitation on petitioner's visitation rights was a "material error."  Pet.'s Visitation Mem. 5; Pet.'s Trial Ex. 7.  Based on my review of the amended order, I am inclined to believe that petitioner's visitation rights did not expire after one year. That being said, regardless of the duration of petitioner's visitation rights, these rights still do not amount to custodial rights as required for the return of the child to Romania. Thus, the length of petitioner's visitation rights is immaterial to a custodial right determination.

for his son's emotional and educational needs. Tr. 12:24–13:15. Respondent argues that, during this time, petitioner once returned L.R. from his scheduled visitation period two days early, despite being allotted a full week with the child. Resp.'s Br. ¶ 63; Tr. 38:12–23. Respondent also alleges that petitioner would return the child home with sunburns, and, on one occasion, returned the child sick. Resp.'s Br. ¶ 61; Tr. 37:13–38:23. Petitioner denies these accusations. Tr. 13:4–24.

In June 2010, respondent informed petitioner that she wished to take their son to Disneyland, California for a week in August. Pet.'s Mem. of Law 5. On June 28, 2010, petitioner signed a form granting his permission.[8] Pet.'s Br. 6; Pet.'s Trial Exs., Ex. 8. Although she received petitioner's approval, respondent never took the child to Disneyland.

On September 17, 2010, respondent and the child moved to the United States without notifying petitioner.[9] Pet.'s Mem. of Law 6; Tr. 41:17–19. On September 25, 2010, petitioner went to pick up his child from respondent's home for his scheduled visit and was told by respondent's parents that respondent and the child had resettled in the United States. Tr. 15:14–19. On September 29, 2010, petitioner received a letter from respondent's attorney, which provided him with respondent and L.R.'s new address and telephone number in Forest Hills, New York. Tr. 16:1–12; Pet.'s Trial Exs., Ex. 9. Petitioner has since had telecommunications with his child via both phone calls and video conference. Resp.'s Br. ¶ 64.

---

[8] Petitioner argues that the fact that respondent had to get his approval to attain a visa for L.R. to travel abroad signifies that he has a ne exeat right. Respondent correctly notes that petitioner's signature was only necessary pursuant to American immigration policy, not pursuant to Romanian law. Tr. 48:1–25.

[9] Respondent notes that she did not tell petitioner that she intended to change the child's domicile because she was "unsure how her relationship with another man—now her husband—would turn out." Resp.'s Br., Ex. 4 at 3. Respondent also maintains that her Romanian attorney told her that, pursuant to law 248/500, respondent did not need petitioner's permission to change the child's domicile. Resp.'s Mem. of Law 6; Tr. 48:1–25.

### D. Petitioner's Legal Proceedings

On February 25, 2011, petitioner filed a petition in the Bucharest Court seeking a decision that respondent's removal and retention of L.R. outside of Romania was illegal. Pet.'s Mem. of Law; Pet.'s Br., Ex. G. On May 5, 2011, the Bucharest Court dismissed the action, finding that petitioner did not have standing to bring the suit and was without remedy of law. Pet.'s Trial Exs., Ex. 15.

### E. Respondent's Life in America

On or about September 27, 2011, respondent became pregnant with her current husband, Florin Toader ("Toader"), and on March 16, 2011, she married him. Resp.'s Br. ¶ 37, Ex. K ("2011 Marriage Certificate"). Respondent gave birth to her second child on June 4, 2011. Tr. 33:11–12. Respondent, her new husband, L.R., and respondent's second child currently live together in Forest Hills, New York. Resp.'s Br. ¶ 28. Since moving to the United States, L.R. has completed kindergarten, learned English, and has made friends. Tr. 39:19–40:14.

## II. DISCUSSION

### A. The Hague Convention

The Hague Convention "was enacted to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." See Gitter v. Gitter, 396 F.3d 124, 129 (2d Cir. 2005) (citation and internal quotation marks omitted). Both the United States and Romania are signatories to the agreement, and it was implemented in the United States when Congress adopted ICARA. See Abbott v. Abbott, ___ U.S. ___, 130 S. Ct. 1983, 1989 (2010).

The Hague Convention is designed to deter parents or other guardians from unilaterally taking children from the country of their habitual residence to another country that might provide

a "more sympathetic forum for a custody dispute." Haimdas v. Haimdas, 720 F. Supp. 2d 183, 196 (E.D.N.Y. 2010) (citing Gitter, 396 F.3d at 129–30), aff'd, No. 10-CV-2532, 2010 WL 4628933 (2d Cir. Nov. 17, 2010). The goal of the Convention in such a situation is to restore the status quo, i.e., to return the child to the country of his or her habitual residence so that a custodial determination can be made there. See Poliero v. Centenaro, No. 09-CV-2682, 2009 WL 2947193, at *8–9 (E.D.N.Y. Sept. 11, 2009), aff'd, 373 F. App'x 102 (2d Cir. 2010) (summary order). This goal is based on the notion that the most suitable forum for a custody dispute is the country of the child's "habitual residence." Id. at *8. Thus, district courts are strictly prohibited from adjudicating the merits of the custody dispute, and are limited solely to determining whether the child should be returned. Id. at *9.

ICARA sets forth specific burdens of proof for petitioners and respondents in Hague Convention actions. To begin, the petitioner has a prima facie burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). The removal and retention of a child abroad is considered wrongful when:

> (a) it is in breach of custody rights attributed to a person, an institution or another body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3. Thus, in order to raise a prima facie case, a petitioner must prove by a preponderance of the evidence that: "(1) the child was habitually resident in one State and has been . . . retained in a different State; (2) the . . . retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights [or would have exercised those rights] at the time of the . . . retention."

7

Gitter, 396 F.3d at 130–131. If a court deems that there has been a wrongful removal or retention of a child under the age of sixteen, and the petition was brought within a year of the wrongful removal or retention, the country in which the child is located must "order the return of the child forthwith," unless the respondent is able to raise an affirmative defense. Hague Convention art. 12. A respondent may assert four possible defenses under the Convention: (1) that there is a grave risk that the return of the child would expose him to physical or psychological harm or otherwise place her in an intolerable situation; (2) that the return of the child would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms; (3) the proceeding commenced more than one year after the removal and the child has become well settled in the new environment; and (4) the petitioner was not actually exercising custody rights at the time of the removal or retention, or had consented to the removal or retention. See Poliero, 2009 WL 2947193, at *9–10 (citing 42 U.S.C. § 11603(e)(2)(A)–(B)). The elements of a wrongful removal and retention with regard to this case are detailed below.

### 1. Habitual Residence

To establish a prima facie case for wrongful removal or retention, a petitioner must first prove that the country from which the child was removed was the child's "habitual residence." Id. Although the term "habitual residence" is not defined in the Hague Convention, the Second Circuit has given courts in this circuit direction. In Gitter v. Gitter, the Second Circuit held that the intentions of the parents are the key factor; more specifically, the "shared intent of . . . the parents . . . at the latest time that their intent was shared." Id. at 134. This determination can be "broken down into two components: whether the parents formed a shared, settled intention to abandon the child's previous habitual residence, and whether the parents have mutually intended

8

that the child acquire a new habitual residence in a new location." Poliero, 373 Fed. App'x. at 104 (internal citations and quotation marks omitted). Typically, once the last shared intent of the parents with respect to habitual residence is determined, that country is deemed the habitual residence of the child. Haimdas, 720 F. Supp. 2d at 198. However, regardless of shared parental intent, a court can decline to order the return of a child if that child has "become acclimatized to his new surroundings" and thereby acquired a new habitual residence. Gitter, 396 F.3d at 133. Courts, however, are "slow to infer that the child's acclimatization trumps the parents' shared intent," and only do so when "requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" Id. at 134 (quoting Mozes v. Mozes, 239 F.3d 1067, 1079, 1081 (9th Cir. 2001)).

### 2. Breach of Rights of Custody

Second, a petitioner must prove that the removal and retention of the child was in breach of his rights of custody. See id. at 130–31. Rights of custody are defined in the Convention as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention art. 5; see also Gitter, 396 F.3d at 130–31. There are three possible sources from which a country can grant custody rights: (1) judicial or administrative decisions; (2) legally binding agreements between the parties; and (iii) an operation of the law of the state of the child's habitual residence. Hague Convention art. 3; see also Haimdas, 720 F. Supp. 2d at 201.

### 3. Exercise of Custodial Rights

Third, and finally, in order to raise a prima facie case, a petitioner must prove that he was actually exercising his rights of custody at the time of the wrongful removal or retention. Hague Convention art. 3; see also Haimdas, 720 F. Supp. 2d at 203.

### C. Petitioner Fails to Establish a Prima Facie Case

As an initial matter, L.R. is under the age of sixteen, see Pet.'s Mem. of Law 3, and the petition was filed on April 6, 2011, which is well within one year of the allegedly wrongful removal and retention, see Hague Convention art. 12; Compl. In support of his prima facie case, petitioner offers his own testimony, documentary evidence introduced at the Order to Show Cause hearing, and pre and post-hearing briefs.[10] For the reasons discussed below, I find that petitioner has failed to establish a prima facie case of wrongful removal and retention by a preponderance of the evidence.[11]

#### 1. L.R.'s Habitual Residence Was Romania When He was Removed

Here, the parties do not dispute that L.R. was a habitual resident of Romania at the time of his removal. Respondent concedes that she removed L.R. from Romania without informing petitioner of the possible permanence of the removal. Tr. 41:17–19. Because petitioner never desired to change L.R.'s residence, the last shared intent of L.R.'s home was clearly Romania. Respondent asserts, however, that the child has fully acclimatized to his current surroundings, and that the child's newly acquired habitual residence is now the United States. Although respondent offers some evidence in support of this proposition,[12] I am reluctant to make a determinative finding on this issue considering that acclimatization is a "difficult test to satisfy,"

---

[10] Petitioner also provided a bench memorandum concerning petitioner's visitation rights. See Pet.'s Visitation Mem.

[11] Petitioner contends that the child's removal was wrongful because respondent obtained his signature for L.R.'s visa on the false pretense that the child would return to Romania after the trip to Disneyland. Tr. 14:1–18. Petitioner also alleges that respondent's abrupt marriage to Toader before the expiration of her visa "evidences conscious awareness on her part that her removal of the Child to the United States was wrongful." Pet.'s Mem. of Law 6, 9, n.4. Later, however, petitioner openly concedes that Romanian law allows the custodial parent to lawfully remove the child for temporary travel outside of Romania. Pet.'s Mem of Law 16. Thus, because respondent had the right to remove the child temporarily from Romania without petitioner's permission, the crux of this case centers on L.R.'s retention in America, not his removal.

[12] Respondent testified that L.R. completed a full year in the American school system, made new friends, speaks English, and now has a new sibling in America. Tr. 40:2–14.

Poliero, 373 Fed. App'x at 105, and found only in "relatively rare circumstances," Gitter, 396 F.3d at 134. Further, I need not engage in such analysis in light of petitioner's failure to establish the other requisite elements of a prima facie case.

### 2. Petitioner Fails to Establish a Breach of His Rights of Custody

The pinnacle issue in this case is whether respondent's unilateral decision to change the child's domicile was in breach of petitioner's rights of custody. Both sides cite to Abbott as the seminal case in determining whether petitioner has a ne exeat right—the right of a parent to require his consent before a child is taken out of the country. Pet.'s Mem. of Law 15; Resp.'s Br. ¶ 20. In Abbott, the Court held that a parent's ne exeat right qualifies as right of a custody under the Hague Convention. See 130 S. Ct. at 1990. Therein, the father and mother separated and a Chilean court awarded visitation rights to the father. Id. at 1988. The Court found that while visitation rights or "rights of access" alone did not amount to a ne exeat right, where the law of the country of residence explicitly requires a parent to give consent before removing the child, a custodial right exists. Abbott, 130 S. Ct. at 1999. Thus, absent an explicit award of custody, the Court consulted the law of the country of residence to determine whether a parent had a ne exeat right. Id. at 1985.

In the case at hand, the final and irrevocable Divorce Decree only awarded petitioner with visitation rights, not custodial rights.[13] Petitioner contends, however, that his visitation rights, in conjunction with four Romanian laws, amount to a ne exeat right. The first law to

---

[13] Although petitioner argues that his visitation rights alone create a ne exeat right, this argument is misguided. See Abbott, 130 S.Ct. at 1988–89 (finding that "direct and regular visitation rights," are recognized as "rights of access," but that these rights alone do not offer a return remedy under the Convention); see also De Vasconcelos v. De Paula Batista, 466 F. Supp. 2d 828, 843 (E.D. Tex. 2006) (noting that a parent who takes the child for a limited time and pays certain child support and educational costs does not have a right of custody, but rather has a "right of access," which does not "invoke the convention protections that require this Court to return the child.") (internal citations omitted).

which petitioner cites is the Romanian Law on the Protection and Promotion of the Rights of the Child, Law 272/2004, which concerns a child's temporary travel abroad. Poret Decl., Ex. C, Law 272/2004, ("Law 272/2004") art. 18(2). That law provides, in pertinent part, that "the child[]'s travel in the country or abroad may only be done when both parents have been notified and have agreed; any misunderstanding between the parents concerning the expression of this agreement is ruled upon by the court of law." Law 272/2004, art. 18(2). Here, respondent did not notify petitioner of L.R.'s travel to the United States; however, any disagreement arising from the child's travel outside of Romania has already been ruled upon by "the court of law"— that is, the irrevocable and final decision rendered in the Divorce Decree, which granted sole custody to respondent.

Upon reading Law 272/2004 in full, the law clearly anticipates that a final and irrevocable custody determination will modify and limit the very parental rights which Law 272/2004 espouses. Article 16, for example, provides that the "court of law, considering the best interests of the child as a priority, can limit the exercise of the [noncustodial parent's right to maintain direct contact]."[14] Law 272/2004 art. 16(1)–(2). The Bucharest court that issued the parties' Divorce Decree did just that, and negated petitioner's custodial rights by awarding respondent sole custody of the child. Divorce Decree 4. Since Abbott, a litany of federal cases has agreed that a court's custodial determination may negate the parental rights otherwise afforded by a country's laws. See, e.g., Haimdas, 720 F. Supp. 2d at 201–03 (finding a custodial right absent an "English court order negating the petitioner's parental responsibility"); Poliero,

---

[14] Article 16 provides in full:
  (1) The child who has been separated from both of his/her parents . . . as a result of a legal measure, has the right to maintain personal relations and direct contacts with both parents, except when this is contrary to the best interests of the child.
  (2) The court of law, considering the best interests of the child as a priority, <u>can limit the exercise of this right</u>, if there are rigorous reasons which may endanger the physical, mental, intellectual, moral or social development of the child. Law 272/2004 art. 16(1)–(2) (emphasis added).

2009 WL 2947193, at *11–12 (holding that in the absence of a court order curtailing petitioner's rights, Italian law confers custodial rights upon both parents.); Fernandez v. Baily, No. 10-CV-84, 2010 WL 2773569, at *3 (E.D. Mo. Jul. 14, 2010) (finding that where a court has not awarded custody to either parent, and Panamanian law requires the written consent of the other parent prior to the removal of the child, a joint ne exeat right exists). Further, it must be noted that the Divorce Decree is silent as to petitioner's right to refuse a change of L.R.'s domicile. De Paula Batista, 2011 WL 806096, at *3 (holding that petitioner did not establish a ne exeat right in light of his failure to show "how the order pertaining to visitation also conferred on [p]etitioner the right to determine [the child's] country of residence"); c.f. Edoho v. Edoho, 10-CV-1881, 2010 WL 3257480, at *5 (S.D. Tex. Aug. 17, 2010) (noting that where the parents stipulated in a custody agreement that the child's travel must be agreed upon, the petitioner had a ne exeat right at the time of the child's removal). Thus, petitioner fails to establish that the Divorce Decree and law 272/2004 create a ne exeat right.

The second law to which petitioner cites is the Status of the Free Movement of the Romanian Citizens Abroad Law 248/2005, ("248/2005"), which states that a minor Romanian citizen may leave the country when accompanied by one of his parents "without the need for the other parent's affidavit, only if the accompanying parent presents proof that she has custody of the minor based on a final and irrevocable court decree." Poret Decl., 248/2005, art. 30(1)(c). This law further clarifies that because respondent has a final and irrevocable Divorce Decree vesting her with sole custody of L.R., she can temporarily remove L.R. from Romania without petitioner's permission.[15] Once again, the Divorce Decree supersedes a prior Romanian law

---

[15] The third provision to which petitioner cites, The Methodological Standards for Implementing Law no. 248/2005 on the status of the free movement of Romanian Citizens abroad, Government Decision no. 94/2006, ("Government Decision 94/2006") art 24., further supports the proposition that a custodial parent can remove the child temporarily without the noncustodial parent's consent. Pet.'s Mem. of Law 17; Government Decision 94/2006, art. 24. Article

13

requiring both parents' consent. The Romanian Consulate affirmed this finding in a letter to this Court, noting that "[i]n accordance with the Romanian Law no. 248/2005, as amended, the parent who has the custody of the child is entitled to request the issuance of a Romanian passport/travel document for the said child and to approve any trip abroad, without the other parent's consent." Second Decl. of Gabriel Tapalaga in Opp. to Verified Pet. and Order to Show Cause, ("Tapalaga Second Decl.") ¶ 3, Ex. 1. Accordingly, Law 248/2005 fails to confer upon petitioner a <u>ne exeat</u> right.

Petitioner concedes that law 248/2005 allows a custodial parent to remove a child on a temporary basis, but juxtaposes this law with Government Decision 94/2006, art. 29, which concerns the right of a parent to change the child's domicile. In 2009, Romania modified and clarified Article 29, such that the most recent version of the provision states as follows:

> The domicile of a minor Romanian citizen is duly established, under the legal provisions, in the state of domicile of both parents, of the surviving parent, [or] of the parent to whom such minor was entrusted by final and irrevocable court decree. . . . In case the parents do not share the same domicile, the domicile of the minor is that established by common agreement between the parents or, in case of disagreement between the parents, by the competent court of law.

Tapalaga Decl. in Opp. to Verified Petition and Order to Show Cause ("Tapalaga Decl."), Ex. 2, ("Modified Art. 29(1)"), ECF No. 14-2.

Similar to the interpretation of Law 272/2004, which necessarily allows the "court of law" to include a court's final custodial determination, the parties' Divorce Decree establishes that L.R.'s domicile is the domicile of the parent awarded full custody—in this case, the respondent's current place of residence. Thus, the Divorce Decree already resolved any disagreement regarding L.R's domicile.

---

24 provides that a "[m]inor Romanian citizen[] shall be allowed to leave the country only accompanied by an adult, provided that . . . a final and irrevocable court decree granting custody of the minor" is produced. <u>Id.</u>, art. 24(1)(c).

Article 29 further expounds that "[e]vidence[16] of the minor's domicile abroad is provided in the form of the . . . (4) the passport of one of the parents and the statement of the other parent's agreement in respect of the minor's domicile, <u>or, as applicable, the final and irrevocable court decision superseding the agreement of the other parent</u>." Modified Art. 29(2)(2). (emphasis added). Thus, pursuant to Article 29, there is no question that respondent, as the parent awarded sole custody by a final and irrevocable court decree, could change L.R.'s domicile without petitioner's permission.

As outlined above, petitioner has not established that he has any <u>ne exeat</u> rights as to L.R. under the Divorce Decree or Romanian law. The Romanian court rendered a final and irrevocable custodial determination in favor of respondent, did not award any custodial rights to petitioner, and was silent as to petitioner's <u>ne exeat</u> rights. This Decree, under Romanian law, then superseded any <u>ne exeat</u> right that petitioner may have had. Accordingly, petitioner fails to establish that respondent's retention of L.R. is in violation of his custodial rights.

**3. Petitioner Failed to Establish His Exercise of Custodial Rights**

Third, and finally, a petitioner must prove that he was actually exercising his rights of custody at the time of the retention. Hague Convention art. 3; <u>see also</u> <u>Haimdas</u>, 720 F. Supp. 2d at 203. Because the Divorce Decree did not afford petitioner with custodial rights, and Romanian law does not grant a <u>ne exeat</u> right in the face of the superseding Divorce Decree,

---

[16] On May 2, 2011, petitioner submitted a letter from the Romanian Consulate which provided an unofficial translation of Article 29. Pet.'s Visitation Br., Ex. 2. The Romanian Consulate affirmed, even more explicitly, that "[t]he <u>proof</u> that the minor has the domicile abroad may be made by . . . (2) the declaration of the other parent, consenting to the domicile of the minor, <u>or if applicable, the final and irrevocable judicial decision through which the court replaced the consent of the other parent</u>." <u>Id.</u>, Ex. 2 at 15. (emphases added).

15

petitioner had no custodial rights to exercise at the time of L.R.'s removal. Accordingly, petitioner fails to meet the third element of his prima facie case.[17]

### III. AFFIRMATIVE DEFENSES

Once a prima facie case is established, the court must order the child's return unless the respondent is able to raise one of four defenses. Because petitioner has not established a prima facie case, I do not find it necessary to delve into the merits of respondent's affirmative defenses.

### IV. CONCLUSION

For the foregoing reasons, petitioner's request for L.R.'s return to Romania is denied. The Clerk is directed to enter judgment against petitioner and close this case.

SO ORDERED.

Dated: August 3, 2011
      Brooklyn, New York

/s/
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

---

[17] It must be noted that petitioner still has visitation rights. Although the geographical distance between petitioner and his son has increased since L.R's move to the United States, petitioner and respondent must still arrange time for petitioner and L.R. to visit.